IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


JOHN H. WAASER,

    Plaintiff,

v.                                                    CASE NO. 1:05-cv-00115-MP-AK

STREIT'S INC.,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Doc. 31, Defendant's Motion for Summary Judgment and Accompanying Statement of Material Facts. Before the Court could issue a *Brown/Griffith* notice, Plaintiff filed responses and his own Statement of Facts. Docs. 33-36. After the notice, Doc. 38, Plaintiff submitted his sworn statement for consideration. Doc. 41. This cause is therefore in a posture for decision.[1] Having carefully considered the matter, the Court recommends that the motion for summary judgment be granted, and this cause be dismissed with prejudice.

## BACKGROUND

The plaintiff, John Waaser, was employed by Defendant on two separate occasions. Doc. 32-2 at 63. On the last occasion, he worked for Defendant as a salesman and then in the parts department from March, 1999, to May 28, 2003, when he was terminated. *Id*. at 64-66. Plaintiff claims that he was terminated because he is an atheist. Doc. 13 at 3. The events leading up to the termination, taken in the light most favorable to Plaintiff, *Evans v. Shephens*, 407 F.3d 1272,

---

[1]The Court scheduled this case for a settlement conference but cancelled it after reviewing the parties' confidential settlement memoranda.

128 (11th Cir. 2005), are as follows:[2]

On March 26, 2003, the day after Plaintiff returned to work following a motorcycle accident, a "kid came in [Streit's] and tried to convert [Plaintiff] to his religion." Doc. 32-2 at 71. According to Plaintiff, he asked the young man "politely at least three times to leave over the next 15, 20 minutes. Told him politely at least four times...that I did not want to have this conversation with him." *Id.* However, "[t]his kid was not capable of carrying on an intelligent conversation. He was an automaton. He knew only what he had been programed to say. And he would go back to repeating the same old lines...." *Id.* at 72. "[I]t was starting to heat up when [Michael Jones, Defendant's owner and president] came upon us." *Id.*; *see also id.* at 17. Plaintiff did not believe he was in a position simply to walk away, and

> finally, I just got so upset that my voice started raising up a bit and one of the salespeople came in and he put his arm around me and he said in a nice low voice in my ear, What's going on? And I turned to him and said in a nice low voice, This asshole is trying to convert me to his religion. The customer did not hear it. And the salesman, I think, then repeated it louder, said something like, What asshole is that? And at that point the customer heard it. And the customer said, Who's an asshole? And at that point I probably exploded and said, You're an asshole.

*Id.* at 72-73.

Mr. Jones turned the matter over to Richard McGraw, Defendant's general manager. *Id.* at 37; *see also id.* at 16-17. McGraw issued Plaintiff a written reprimand, advising him "to be kinder and gentler and learn to keep his mouth shut" and placing him on probation until June 3,

---

[2]Almost all of these facts are taken from Plaintiff's own sworn testimony given in proceedings before an administrative law judge addressing Plaintiff's claim of religious discrimination made with the Florida Commission on Human Relations.

*Case No: 1:05-cv-00115-MP-AK*

2003.[3]  *Id*. at 38.  Mr. McGraw told Plaintiff that he wanted to terminate him but that Mr. Jones "would not allow him to do so."  Doc. 32-3 at 139.  As explained in Plaintiff's Sworn Statement submitted in opposition to the motion for summary judgment, Mr. Jones would not allow his immediate firing because of a recent loan Streit's had made Plaintiff to purchase a car after his motorcycle wreck, and "the fact that the check they would have to hand to Plaintiff would not cover the amount of Plaintiff's account balance."  Doc. 41-2 at 6-7 & 10.  Mr. McGraw's desire to fire him "shocked" Plaintiff.  Doc. 32-2 at 77.  During the course of the next two weeks, "there was not one word exchanged between Mr. McGraw and [Plaintiff]."  *Id*. at 78.  According to Plaintiff, "That told me that his response to this was much stronger than it should have been" and led to a private conversation with Mr. McGraw in which Plaintiff explained to him "I don't believe in God [and have] some rather controversial views on Jesus Christ."  *Id*. at 78.  In Plaintiff's view, "I felt it was obvious...that Mr. McGraw was not reacting to anything I said to the customer, but was reacting to my religious views, because you don't exhibit the hatred that I thought he was exhibiting toward me based on an incident with a customer, especially an isolated one."  *Id*. at 78-79.  Thus, "based on the conduct of Mr. McGraw toward [him] in the next week or two," it was Plaintiff's "impression that [he received the disciplinary report] because of [his] religious beliefs."  Doc. 32-3 at 136.

Nothing of any significance apparently occurred during the next few months.  Then, a few days before Plaintiff's immediate supervisor, Fred Marzloff, left for a scheduled two-week vacation, Defendant hired a new employee to begin on May 27, 2003, when Marzloff returned

---

[3]Plaintiff had previously been reprimanded for "bouncing checks at Streit's."  Doc. 32-3 at 149.  According to Plaintiff, "they couldn't have been very worried about those checks," as Defendant later gave him "another raise and a loan."  Doc. 32-2 at 80.

from vacation.  Doc. 32-2 at 103.

During Marzloff's absence, three incidents happened almost back to back which, in addition to the March incident, Defendant used as bases for Plaintiff's termination.  The first involved a customer for whom Plaintiff had ordered some parts with the proviso that "the only way [Plaintiff] would do that would be if [the customer] paid in full and agreed that the parts were not to be refundable" if they did not fit.  Doc. 32-2 at 83.  On May 20, 2003, the customer and his wife "came in [with a bit of an attitude] and wanted to get a refund on the parts, and [Plaintiff] refused to rescind the agreement under which [the customer] had ordered the parts." *Id*. at 84 & 87.[4]  The customer's wife "had not been a party to the first agreement and she had not witnessed it and she thought I was being very rude and short with [her husband].  And she apparently at some time later got in touch with Streit's...."  *Id*. at 84-85.  According to Plaintiff, his decision not to refund the money for the parts "was a valid decision and...was in the company's interest," and the customers "could have asked at any time to speak to my superior."[5] *Id*. at 85.

The second incident occurred later that same day.  Plaintiff was on the telephone with a distributor representative, to whom he and his supervisor, Fred Marzloff, spoke several times a day.  *Id*. at 88.  According to Plaintiff, "we sometimes used a bit of an abusive tone of voice with each other...bantering back and forth."  *Id*.  On this occasion, the representative asked Plaintiff if

---

[4]Plaintiff later learned that someone in the service department had told the customer that Plaintiff did not "know what he's talking about" regarding the availability of the subject parts. Doc. 32-2 at 87.

[5]Defendant does not dispute the propriety of Plaintiff's decision regarding the handling of the transaction, only "his manner and the way he acted towards [the husband]" based on the wife's complaint to Mr. McGraw.  Doc. 32-3 at 153-56.

Mr. Marzloff was "slacking off." *Id*. Plaintiff responded, "No, Fred's on vacation, didn't he tell you? He's up in North Carolina riding his motorcycle in the mountains and enjoying the fucking rain." *Id*. According to Plaintiff "that's the only time that word was used. There was...a smile on my face and it was spoken in a normal voice into a telephone receiver." *Id*. The representative "was a young motocross racer and beer drinker, party boy. That word is certainly in his vocabulary. I thought it was appropriate at the time." *Id*. at 89. Plaintiff maintains that to the "best of [his] recollection, there were no customers in the department. If there was one customer, it would have been one only and he would have been 12 feet behind [Plaintiff] and...he could [not] have heard what [Plaintiff] was saying."[6] *Id*. In Plaintiff's view, his use of profanity did not "constitute[ ] any kind of a serious violation of anything."[7] *Id*. at 90.

Four days later came "the infamous attempt to steal a sale, a customer...." *Id*. at 90. According to Plaintiff, it "was late on Saturday," and he was "doing [Matt Beaulieu's] job putting stuff away," when a customer entered the store. *Id*. at 90-91. Beaulieu "greeted this customer as he walked through the front door," though in Plaintiff's view, he "should have been the one to greet the customer." *Id*. at 91. The customer was due a refund, but he "apparently

---

[6]Marion Jones, the co-owner and secretary-treasurer of Streit's, heard Plaintiff say, "Fred is a F'ing idiot, or words of that tone," as she went upstairs to her husband's office. Doc. 32-3 at 177. According to her, there was at least one customer at the parts counter, and she told Plaintiff "that it's absolutely not allowed to have that type of language in our store and in front of a customer, you would never speak of your manager in that way." *Id*. at 177-78. She then took the matter up with McGraw. *Id*. at 178. Plaintiff denies calling Mr. Marzloff an idiot, indicating he was speaking of someone else, but certainly does not deny using the expletive. *Id*. at 179-80.

[7]At the hearing, Respondent introduced two written reprimands for these incidents indicating that Plaintiff refused to sign them. Doc. 32-2 at 41-42. Plaintiff maintains that he was not given the opportunity to sign the documents until he "was about to get up and walk out the door no longer an employee of Streit's." Doc. 32-3 at 104.

considered that money as having been spent...and all he wanted was something of value for it and so he came in to buy a helmet...." *Id*. at 91-92.  Beaulieu asked Plaintiff to check the fit of the customer's helmet, which the customer purchased, but when Beaulieu "could not cashier that sale" because he "did not know how to handle...a refund to pay for the helmet" or to price a second helmet the man was purchasing, Plaintiff "typed it up in the computer and, force of habit...used [his] own initials on it." *Id*. at 94-95.  Beaulieu reported this loss of commission to Mr. McGraw.  *Id*. at 95.  Though Plaintiff did not "believe that [Beaulieu] deserved the commission on that sale," if he "had said something to me, we could've worked something out."[8]  *Id*.

Plaintiff maintains that his "firing goes back to the incident in March where [his] religious views were divulged."  *Id*.  In support of that contention, Plaintiff points to the fact that during the same time period when he was on probation from the March incident, he won an expensive motorcycle helmet based on his sales of a particular helmet brand:  "[Y]ou can't possibly win a prize this big in a sales contest by being rude to customers on any kind of a general basis."  *Id*. at 119-20.  He also argues that although Marzloff was rude to customers and on one occasion, the service manager came "out from behind the counter with fists swinging" in response to a customer's complaints, neither was fired.  *Id*. at 121-23.  In Plaintiff's view, "The incidents that I was fired for were picayune."  *Id*. at 126.  Further, the decision to fire him was

---

[8]Defendant issued another written reprimand for this incident, which it maintains Plaintiff refused to sign.  Doc. 32-2 at 43.  Plaintiff maintains that Defendant falsified its records.  Doc. 32-3 at 101.  Mr. McGraw stated that he personally observed Beaulieu working with the customer.  *Id*. at 157-58.  McGraw also explained that although he had already made the decision to terminate Plaintiff, the incident with Beaulieu occurred, and he "was going to put as much documentation in the file as [he] could...."  *Id*. at 158-59.

"cemented at the time of the incident with the customer who tried to convert Plaintiff to his religion, and that nothing which occurred during the time [Marzloff] was on vacation had anything to do with that decision." Doc. 41-2 at 10. According to Plaintiff, his firing was timed to coincide with the return of Marzloff, since during Marzloff's absence, there was nobody else at Streit's "who was capable of running [the parts] department other than [Plaintiff]." Doc. 32-3 at 102. "[W]ithin hours after that kid was certified ready to talk to customers, [Plaintiff] was called upstairs and fired." *Id*. at 104.

Plaintiff acknowledges that he was an employee at will and that, "[w]ith provocation," he was rude to the customer in March. Doc. 32-3 at 130 & 137. However, he was "certainly not the only employee at Streit's who was ever rude to a customer." *Id*. at 137. Plaintiff further recognizes that being put on probation by Mr. McGraw for being rude to the customer "meant that I was not to engage in that type of behavior" and maintains that he "generally did that." *Id*. Plaintiff was never asked by Defendant "to fill out any paperwork indicating ...[his] religious preference," and before the March incident, he was never "quizzed by an employee of Streit's regarding [his] religious preference...." *Id*. at 140-41. However, after the incident, he was told by another employee of Streit's (not Mr. McGraw or Mr. Jones) "in no uncertain terms that not everybody agreed with [his] religious beliefs." *Id*. at 142-43. Though Mr. McGraw "never mentioned" religion, in Plaintiff's view, "he exhibited such hatred toward me that it had to have had a reason other than merely how I interacted with the customer." *Id*. at 144. He admits, however, that Mr. McGraw "did not like [him] from the start" because Plaintiff "is a liberal [and] openly gay and a Yankee to boot." Doc. 41-2 at 4. Plaintiff does not know what McGraw's religious beliefs were but "assume[d] that he has strong religious beliefs. He is one of those

right-wing Rush Limbaugh fanatics and...an NRA nutcase." *Id*. at 144-45.  There was "certainly not" any "overt religious overtone" at Streit's "with Mr. Jones or not until...Mr. McGraw came along...."[9]  *Id*. at 146.  In fact, Plaintiff admits that Defendant's employee handbook expressly prohibits religious discrimination and that Defendant "does not attempt to hire people based on membership in any particular religion."  Docs. 31 & 36.

Defendant maintains that the incident in which Plaintiff called the customer an "asshole" was "strike two and there wasn't going to be a three," Doc. 32-3 at 150, and that the incident over the parts was "basically the final straw."[10]  *Id*. at 152.

## DISCUSSION

On a motion for summary judgment, the Court must ascertain whether there is a genuine issue of material fact.  Fed. R. Civ. P. 56(c).  This requires the Court to evaluate "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 250 (1986).  The United States Supreme Court has stated that "this standard mirrors the standard for a directed verdict...which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.  If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51 (citation

---

[9] According to Mr. McGraw, he too is an atheist.  Doc. 32-3 at 161.

[10] Mr. McGraw had already made the decision to terminate Plaintiff after the parts incident, pending direct confirmation of the incident with the customers.  Doc. 32-3 at 156-57.

omitted).[11]  Further, the Court has noted that the "genuine issue" summary judgment standard is very similar to the "reasonable jury" directed verdict standard, the primary difference between the two being procedural, not substantive.  *Id*. at 251.  "In essence...the inquiry under each is the same:  whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251-52.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"  *Id*. at 252 (citation omitted).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.

In an employment discrimination case where there is no direct evidence of discrimination, the Court looks to the shifting burdens of *McDonnell Douglas* for guidance.  *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

Defendant, citing a case involving a failure to accommodate an employee's religion, disputes that Plaintiff can establish a prima facie case of religious discrimination, arguing that

---

[11]While the terminology has changed, a motion for directed verdict having been replaced with the motion for judgment as a matter of law, the standard has not.  Fed. R. Civ. P. 50.

Plaintiff cannot show that it has "any employment requirements with which Plaintiff's religious beliefs conflict" or that he ever informed Defendant of his religious beliefs. Doc. 31 at 7. This is not, however, a failure to accommodate case, and thus, neither of these matters is at issue. Instead, this is a disparate treatment case, Plaintiff claiming that he was terminated not because he was rude to customers or otherwise violated Defendant's rules or policies but because he is an atheist, and thus, the more appropriate prima facie elements which Plaintiff must prove are these: that he did not violate any of Defendant's rules or policies or that, if he did, other employees who engaged in similar acts but were not atheists were not punished similarly. *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980).[12] Once the prima facie case is established, the burden of production, but not of persuasion, falls on Defendant to articulate a legitimate, nondiscriminatory reason for its termination of Plaintiff's employment. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). If Defendant satisfies this burden, then the burden of production–and of persuasion–returns to Plaintiff "to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Id*.

If Defendant's proffered reason "is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Id*. at 1088. "Quarreling with that reason is not sufficient." *Id*. Because the ultimate burden of persuasion lies with Plaintiff, she may prevail "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact

---

[12]While there is no single standard for establishing a prima facie case of discrimination, *McDonnell Douglas*, 411 U.S. at 802 n.13, the Court believes that *Green* provides the most analogous framework.

to find illegal discrimination." *Id*. However, Plaintiff's personal belief that she was discriminated against, without any supporting evidence, is insufficient to establish pretext. *Mosley v. MeriStar Management Co.*, 137 Fed. Appx. 248, 251 (11th Cir. 2005).

It must be remembered that this Court does not sit as a "super personnel department that second-guesses employers' business judgments." *Lee v. GTE Florida, Inc*., 226 F.3d 1249, 1253 (11th Cir. 2000) (citation omitted). Therefore, it is insufficient for Plaintiff to show the Court merely that Defendant made a mistake or an unwise decision in terminating his employment. *Id*. at 1254.

Having carefully considered the matter, the Court does not believe that Plaintiff has presented sufficient evidence to raise a genuine issue of material fact that he was treated differently than other employees who engaged in similar conduct who were not atheists. While he stated that Defendant did not terminate either Mr. Marzloff after he was rude to customers or the other employee after he physically threatened a customer, Plaintiff has presented nothing else which would show that the actions of these other employees were truly similar to his or what their religious preferences are.

However, because Defendant did not argue the failings of the prima facie case in this light, the Court does not think it appropriate to grant summary judgment on this ground, and thus, the Court turns to whether Defendant articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Indisputably, Defendant has met this burden, *see*, *e.g*., *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1361 (11th Cir. 1999) (yelling vulgarities in front of customers is legitimate, non-discriminatory reason for termination), and the Court must now consider whether Plaintiff has raised a genuine issue of material fact that the proffered

reason for his termination is a mere pretext for discrimination.  Here, Plaintiff fails.

Plaintiff does not deny that he called the customer an "asshole" or that he used the f-word during a telephone conversation with another person or that he may have been rude to the customers requesting the refund on the parts.  Rather, he offers justification–the religious customer provoked the outburst; the parts customers had an attitude--and explanation–no customers heard the telephone conversation, and the use of the f-word was appropriate in the context of the conversation--for his actions, neither of which is sufficient to show that the reasons offered for his termination should not be believed.  The fact that Plaintiff disagrees with the reasons offered for his termination or thinks that what he did was "picayune" is immaterial and does nothing to meet his burden of showing that religious animus motivated his termination. Furthermore, Plaintiff's subjective belief that his atheism formed the basis for his termination is just that–subjective belief.  He was not immediately terminated, as Defendant's policy and procedures certainly allowed, *see* Doc. 32-2 at 20 (use of profanity in angry and belligerent manner towards customers or other employees is grounds for termination), and his explanation for why Defendant waited two months after it found out he was an atheist to fire him is actually perfectly reasonable but does nothing to prove that Defendant harbored religious animus towards him.  Plaintiff himself acknowledges that McGraw never liked him because, in Plaintiff's words, he was a liberal gay Yankee, quite antithetical to the description given of Mr. McGraw, but an employer can fire an employee for good reason, bad reason, or no reason, as long as it is not an illegal reason.  *Damon*, 196 F.3d at 1361.  The employer can also wait to terminate an employee from his job until it suits the employer's business plans.  The Court does not second-guess those decisions.  Even if the decision to terminate Plaintiff was "cemented" at the time he called the

customer an "asshole," he simply cannot make the necessary showing that the decision to terminate him, regardless of when it was made, was motivated by his atheism, and not by the blatant violation of Defendant's rules and policies.

In short, the Court is of the opinion that the evidence in this case is so one-sided that Defendant must prevail as a matter of law, Plaintiff having failed to raise a genuine issue of material fact that the reasons offered by Defendant for his termination were a pretext for religious discrimination.

## CONCLUSION

Having carefully considered the matter, the Court recommends that Defendant's motion for summary judgment, Doc. 31, be **GRANTED**, and this cause be **DISMISSED WITH PREJUDICE**.

**IN CHAMBERS** at Gainesville, Florida, this  _19th_  day of September, 2007.

*s/ A. KORNBLUM*
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**